## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**KENNETH WAYNE ADKINS,**

**Plaintiff,**

**v.**                                          **CIVIL ACTION NO. 3:09-01111**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The case is presently pending before the Court on the parties' cross-motions for judgment on the pleadings. (Docket Nos. 10 and 11).

The undersigned United States Magistrate Judge has fully considered the evidence and the arguments of counsel.   For the reasons set forth below, the undersigned proposes and recommends that the United States District Judge find that

1

the decision of the Commissioner is not supported by substantial evidence and should be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  <u>Procedural History</u>

Plaintiff, Kenneth Wayne Adkins (hereinafter "Claimant"), has applied for social security benefits five times, including the instant matter. According to a prior administrative decision, he filed concurrent DIB and SSI applications on March 26, 1992, and again on September 29, 1998, all of which were denied at the initial level and not pursued further. (Tr. at 35). He later applied for DIB and SSI on November 13, 2001, alleging disability beginning on July 31, 2001;[1] these applications were denied on December 26, 2002, after an administrative hearing. *Id.* Claimant next filed DIB and SSI applications on January 31, 2003, alleging a disability onset date of December 27, 2002, which were denied by decision dated April 30, 2004.[2] (Tr. at 35-43).

On May 17, 2004, Claimant filed his present applications for DIB and SSI, alleging that he became unable to work on July 31, 2001 due to conditions involving his "legs, back, arms/hands...nerves" and the fact that he was a "slow learner."[3] (Tr. at 68-70, 386-387, and 76). These applications were denied initially (Tr. at 46-50 and 395-397) and upon reconsideration. (Tr. at 53-55 and 399-401). Claimant then filed a timely request for a hearing before an Administrative Law Judge. (Tr. at 56). A hearing was held on November 10, 2005 before the Honorable Algernon W. Tinsley (hereinafter the

---

[1] The decision states an onset date of July 31, 2002 on the first page and  July 31, 2001 on the second page.  (Tr. at 35-36).  Clearly, the 2001 date is the accurate one.

[2] Claimant initially alleged a disability onset date of July 31, 2002, but modified that date in view of the prior adjudication of no disability through December 26, 2002.

[3] This date was also amended to an onset date of May 1, 2004 to account for the April 30, 2004 decision of no disability.

"ALJ"). (Tr. at 402-467). The ALJ issued a partially favorable decision on December 28, 2006, finding that the Claimant had been under a disability between May 1, 2004 and October 18, 2005. (Tr. at 10-23).   The ALJ further found that the Claimant had improved medically beginning on October 18, 2005 and was no longer disabled as of that date.  *Id.*

The ALJ's decision became the final decision of the Commissioner on August 7, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 5-7). The Appeals Council did, however, incorporate additional evidence that it had received into the record. (Tr. at 8).

On October 10, 2009, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed his Answer on December 21, 2009. (Docket No.  7). The parties filed their briefs in support of judgment on the pleadings on July 12, 2010 and August 11, 2010. (Docket Nos. 10 and 11).

## II.   Summary of Findings by the ALJ

Under 42 U.S.C. § 423(d) (5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months" 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. § *Id.* 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(e).

By satisfying inquiry four, the claimant establishes a prima facie case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable

4

mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). That section provides as follows:

(c) *Rating the degree of functional limitation.*

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

5

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the supportive medical findings, along with the impairment's rating, degree, and attendant functional limitations, to the criteria of the most similar listed mental disorder to determine if the severe impairment meets or equals the listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520a(d)(3).

The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2).

6

In this particular case, the ALJ found that the April 2004 decision on Claimant's preceding applications was final and binding. (Tr. at 13). Therefore, the ALJ adjusted the date of Claimant's alleged onset to May 1, 2004, one day following the prior unfavorable decision, to avoid re-adjudicating the period covered by the former ruling. *Id.* At the first step of the analysis, the ALJ determined that Claimant met the insured status requirements as of May 1, 2004 and had not engaged in substantial gainful activity since that date. (Tr. at 17, Finding Nos. 1 and 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of back, leg, arm, and hand pain. (*Id.* at Finding No. 3). At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at Finding No. 4).

The ALJ then found that Claimant had the residual functional capacity (hereinafter "RFC") to "lift/carry 50 pounds occasionally and 25 pounds frequently and inability to perform gross or fine manipulation." (Tr. at 17, Finding No. 5). As a result, Claimant could not return to his past relevant work as a semi-tractor trailer driver, defined as a medium, semi-skilled position; a pizza driver, defined as a light, unskilled position; an industrial cleaner, defined as a medium, unskilled position; and a window frame machine trimmer/wrap machine operator, defined as light, unskilled work. (Tr. at 18, Finding No. 6).

The ALJ considered that Claimant was defined as a younger individual aged 18-44, that he had a limited education, that he could communicate in English, and that his acquired job skills did not transfer to other occupations within the RFC assessed for the

period of May 1, 2004 through October 17, 2005. (*Id.*, Finding Nos. 7-9). On this basis, there were no jobs that existed in significant numbers in the national economy that Claimant could have performed for that period and Claimant was disabled, as defined by the Social Security Act, from May 1, 2004 through October 18, 2005. (Tr. at 18-19, Finding Nos. 10 and 11).

However, the ALJ found that Claimant's medical condition improved and that beginning October 18, 2005, he did not have an impairment or combination of impairments that equaled an impairment listed in Appendix 1. (Tr. at 19, Finding Nos. 12 and 13). The ALJ based this conclusion upon treatment notes from October 2005 that suggested that Claimant's bilateral carpal tunnel syndrome and overall pain symptoms had improved.  (Tr. at 19).  Consequently, the ALJ found that beginning on October 18, 2005, Claimant had the RFC to "lift/carry 50 pounds occasionally and 25 pounds frequently." (Tr. at 20, Finding No. 14). The ALJ stated that Claimant's medical improvement related to his ability to work and, although he could not perform his past relevant work as of October 18, 2005, transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding of "not disabled."   Relying upon the testimony of the vocational expert, the ALJ determined that Claimant could perform jobs such as bench worker, assembler, hand packager, product inspector, kitchen helper, and laundry worker, all of which existed in significant numbers in the national economy. (Tr. at 21-22, Finding Nos. 15-18). As such, the Claimant's disability ended on October 18, 2005. (Tr. at 22, Finding No. 19).

## III.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.  In *Blalock v. Richardson*, 483 F.2d 773 (4th Cir. 1972) the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, *supra at* 776, quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id*. However, the Court must not abdicate its "traditional function" or "escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).  The Court decides "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th

Cir. 2001).  Even given the limited scope of review, a careful examination of the record reveals that the ALJ failed to properly consider Claimant's mental impairments and, therefore, the Commissioner's decision is not supported by substantial evidence.

## IV.    Claimant's Background

Claimant was 27 years old at the time of the administrative hearing. (Tr. at 407). He "started," but did not complete, the ninth grade. (Tr. at 407-408). He was placed in special education classes beginning in the third grade and repeated the third and sixth grades. (Tr. at 408). His past relevant employment included driving a semi-tractor trailer, delivering pizzas, cleaning septic tanks, and operating a window frame trimming machine and a wrapping machine. (Tr. at 463).

## V.    The Medical Record

The Transcript of Proceedings has been reviewed in its entirety. (Docket No. 8). However, because the undersigned finds that the Commissioner's decision is not supported by substantial evidence in regard to Claimant's alleged mental impairments, the discussion of the medical evidence will be confined to the records which are germane to Claimant's mental health and intellectual capabilities.

On that note, the record contains numerous evaluations completed by examining and non-examining agency sources, as well as treatment records and evaluations completed by Claimant's psychiatric providers. This evidence is discussed in turn below.

### A.    Evaluations by Agency Sources

On August 10, 2004, the Department of Disability Services (hereinafter "DDS") retained licensed psychologist, Robert G. Martin, M.A., to perform a mental status examination, intelligence testing, and psychological evaluation of Claimant. (Tr. at 164-

10

171). Mr. Martin noted that the quality of information that Claimant provided during the interview was "questionable," although he confirmed that Claimant was "cooperative" and "answered all questions posed to him." (Tr. at 164, 167). When providing history, Claimant described a dysfunctional childhood with episodes of abuse.  (Tr. at 165).  He denied any psychiatric hospitalizations, psychotropic medications, outpatient counseling, or episodes of substance abuse.  (Tr. at 166). As far as his educational history, Claimant told Mr. Martin that he had completed the eighth grade, but had never obtained a GED, because he "took the test four times and failed each time."  (Tr. at 166). Mr. Martin administered the Weshler Adult Intelligence Scale-III, and Claimant received a verbal IQ score of 71, a performance IQ score of 75, and a full scale IQ score of 70.  Mr. Martin considered these scores to be valid and noted that they fell within the borderline range of intellectual functioning. (Tr. at 170). He further found that Claimant read at a fourth grade level, spelled at a second grade level, and performed arithmetic at a third grade level. *Id.* Mr. Martin noted the following:

**DIAGNOSTIC IMPRESSIONS**

AXIS I:      300.00 Anxiety Disorder NOS
AXIS II:     V62.89 Borderline Intellectual Functioning
AXIS III:    Frequent dizziness, leg, back, arm, and hand pain, and arthritis per claimant report.

**ASSESSMENT:**

The diagnosis of Anxiety Disorder NOS is based on claimant's report of frequent worry, difficulty controlling worry, difficulty falling asleep, and irritability and may be related to the large amount of caffeine he consumes on a daily basis. The diagnosis of Borderline Intellectual Functioning is based on a valid full scale IQ score of 70. Based on mental status data, immediate memory is within normal limits, recent memory is severely deficient, and remote memory is mildly deficient. Attention and concentration are moderately deficient based on performance on the Digital Span subtest. Task persistence and pace are within normal limits

based on performance during psychological testing. Social functioning is mildly deficient based on observed behavior during the interview.

*Id.*

On October 4, 2004, DDS psychologist, Frank Roman, Ed.D., completed a Psychiatric Review Technique form. (Tr. at 175-188). Dr. Roman found that a RFC assessment was necessary and diagnosed Claimant with a 12.02 Organic Mental Disorder of borderline intellectual functioning and a 12.06 Anxiety Disorder. (Tr. at 176 and 180). Dr. Roman did not note any pertinent symptoms, signs, or laboratory findings that substantiated the presence of the impairments. *Id.* However, he noted the evidence which he considered. (Tr. at 187). On a scale of "none," "mild," "moderate," "marked," and "extreme," Dr. Roman found that Claimant had a "mild" restriction of activities of daily living and difficulties in maintaining social functioning; a "moderate" difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 185). Dr. Roman documented that records from the Board of Education verified that Claimant had been in special education classes at school and that his IQ was in the "80's in 1994."[4] (Tr. at 188).

On the same date, Dr. Roman completed a mental RFC assessment. (Tr. at 189-192). On a scale of "not significantly limited," "moderately limited," "markedly limited," "no evidence of limitation," and "not ratable on available evidence," he found that Claimant was "not significantly limited" in fourteen of the areas listed, "moderately" limited in five areas, and that there was "no evidence of limitation" in one area. (Tr. at

---

[4] Presumably Dr. Roman found Claimant's borderline intelligence, as reflected in the 2004 IQ testing, to establish a 12.02 impairment rather than a 12.05 impairment largely based upon the school board records. Unfortunately, those records were not made a part of the transcript.

189-190). Dr. Roman noted that Claimant's limitations did not meet or equal a mental impairment listing and that he was able to perform activities of daily living and follow routine repetitive work activities in a low stress setting. (Tr. at 191).

On February 7, 2005, DDS reviewer, Joseph Kuzniar, Ed.D., completed a Psychiatric Review Technique form. (Tr. at 276-289). Dr. Kuzniar found that a RFC assessment was necessary and diagnosed Claimant with a 12.02 Organic Mental Disorder, a 12.04 Affective Disorder, and a 12.06 Anxiety-related Disorder. (Tr. at 276). However, Dr. Kuzniar did not respond to the sections related to either of the first two diagnoses and only responded to the section related to the Affective Disorder. (Tr. at 277, 279, and 281). He also did not respond to the section where he was asked to rate Claimant's functional limitations. (Tr. at 286).   As far as the Claimant's intelligence level, Dr. Kuzniar noted that IQ scores in 1994 reflected a verbal IQ of 82; a performance IQ of 84; and a full scale IQ of 81.   (Tr. at 288).   Dr. Kuzniar also referenced IQ scores taken in 2003 that reflected a verbal IQ of 73; a performance IQ of 89; and a full scale IQ of 81.  He commented that these scores were "given more weight" than the 2004 IQ scores, although he does not specify the reason for that decision.  (Tr. at 288).   Because the actual 1994 and 2003 test results are not contained in the transcript, the record before the Court is unclear as to whether these scores were considered valid and consistent with the developmental history and degree of functional limitation present at those times.

On the same date, Dr. Kuzniar completed a mental RFC assessment. (Tr. at 290-293). He rated Claimant "not significantly limited" in nine areas, "moderately limited" in four areas, and noted that there was "no evidence of limitation" in seven areas. (Tr. at

290-291). He added that Claimant could understand, remember, and carry out "1-3 step instructions within a low social interaction demand work setting." (Tr. at 292).

### B.   <u>Treating Mental Health Care Sources</u>

The records document Claimant's treatment at Prestera Center for Mental Health Services ("Prestera") from October 5, 2004 through October 24, 2005. (Tr. at 252-275, 294-300, and 338-345).   On October 5, 2004, as part of his intake assessment, James Mitchell, a case manager at Prestera, completed a twelve page "West Virginia Assessment: Version 6 Care Connection Form" regarding Claimant. (Tr. at 257-269). Mr. Mitchell noted that Claimant had severe depression and anxiety; a history of poor anger control; severe withdrawal; and poor concentration. *Id.*  He further documented moderate dysfunction in self care and community living; marked dysfunction in social, interpersonal and family activity; marked dysfunction in concentration and task performance; and mild dysfunction in maladaptive, dangerous or impulsive behaviors. *Id.*  Thereafter, Claimant began outpatient counseling and treatment with psychotropic medications. (Tr. at 252-275, 294-300, and 338-345).

On February 11, 2005, Claimant was evaluated at Prestera by clinical psychologist Paul A. Mulder, Ph.D., and supervised psychologist Katie Dawson, M.A., who together performed a clinical interview, mental status examination, Beck Depression Inventory, and Weschler Adult Intelligence Scale (Tr. at 294-300). In his interview, Claimant reiterated that he dropped out of school in the ninth grade at age 18.  He stated, "I just got tired and fed up, they were gonna hold me back in the 9th grade so I quit."  (Tr. at 296).  He told the examiners that he had been held back in 3rd and 6th grades, receiving mainly D's and F's, and had been in "learning disabled" classes since 3rd grade. *Id.* The

14

Beck Depression Inventory revealed that Claimant suffered from moderate to severe depression.  On the Weschler test, he received a full scale IQ score of 77, a performance IQ score of 84 and a verbal IQ score of 74.   He appeared to be functioning in the borderline range of intelligence. (Tr. at 299). Based on their evaluation, Dr. Mulder and Ms. Dawson concluded the following:

> **DIAGNOSIS:**
>
> AXIS I:        296.32 Major Depressive Disorder, Recurrent, Moderate.
>
> AXIS II:       V62.89 Borderline Intellectual Functioning
>
> AXIS III:      Chronic pain per client report.

(Tr. at 300).

The last treatment note from Prestera that is included in the record indicates that Claimant's depression was successfully controlled by medication, but that he experienced difficulty falling asleep. (Tr. at 338). Prestera advised him to continue taking Paxil as directed, to ask for an increase in Neurontin, and to return for follow-up treatment in "2 ½ months." *Id.*

## VI.   **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the final decision of the Commissioner is not supported by substantial evidence because the ALJ did not (1) address Claimant's psychological impairments or (2) consider the totality of the evidence when finding that Claimant's condition improved to the point that he could return to substantial gainful employment on October 18, 2005. (Pl.'s Br. at 10-11).

The Commissioner asserts that (1) it was Claimant's burden to prove that he was entitled to benefits and (2) the ALJ's finding that Claimant had medically improved to

the point that he could perform medium work is well supported by the evidence.  (Def.'s Br. at 6-9).  Regarding Claimant's alleged mental impairments, the Commissioner argues that Claimant failed to prove that the error was harmful and that none of the medical source opinions demonstrate work-preclusive mental limitations.  (Def.'s Br. at 7, Fn. 3).

## VII.  <u>Discussion</u>

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a); *see Brooks v. Astrue*, 2009 WL 899440, *2 (S.D.W.Va.,2009); *see also Wiley v. Astrue*, 2008 WL 4446679, *5 (S.D.W.Va. 2008). This technique is expressly designed to (1) identify the need for additional evidence to determine impairment severity; (2) consider and evaluate functional consequences of the mental disorder relevant to the Claimant's ability to work; and (3) organize and present the findings in a clear and concise manner. 20 C.F.R. § 404.1520a(a). Integral to completion of the special technique is proper documentation of the process. 20 C.F.R. § 404-1520a(e).

At the hearing level, the ALJ "must first evaluate [the claimant's] pertinent symptoms, signs and laboratory findings" to ascertain whether the claimant has a medically determinable mental impairment.  20 C.F.R. 404.1520a(b)(1).  If a medically determinable mental impairment exists, then at step two, the ALJ must rate the degree of functional limitation resulting from the impairment. 20 C.F.R. 404.1520a(b)(2).  To accomplish this, the ALJ must analyze the degree of limitation observed in each of four broad functional categories.  *Id.*  The ALJ must then document his findings and conclusions.  20 C.F.R. 404.1520a(e) requires the ALJ to prepare a decision that:

. . .incorporates the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). **The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.**" (emphasis added).

Continuing the sequential evaluation, using the special technique, at step three of the process, the ALJ is required to determine the severity of the mental impairment based upon the extent of the functional limitations.

Here, Claimant alleged mental impairments, including depression, anxiety and borderline intellectual functioning. When he applied for benefits, he asserted that he was unable to work, in part, due to the fact that he was a "slow learner" and because of his "nerves." (Tr. at 76). In addition, during the administrative hearing, the ALJ questioned Claimant about his treatment at Prestera. (Tr. at 411). Claimant responded that he was being treated for anxiety and depression and that he attempted to decrease his visits to once per month, but Prestera advised him to resume treatment at a frequency of two to three times per month. *Id.* Claimant also discussed that as a result of taking Neurontin, a medication that he was prescribed to help him sleep, he felt sedated and was even less able to concentrate. (Tr. at 413). Claimant stated that he did not complete the ninth grade, that he could only "somewhat" read and write, that he could not perform arithmetic, and that he never received a "GED." (Tr. at 424-425).

Moreover, the objective medical evidence substantiated the existence of these claimed mental impairments. On August 10, 2004, a licensed psychologist stated that Claimant's full scale IQ was 70 and that this score was valid. (Tr. at 170). He diagnosed Claimant with an organic mental disorder of borderline intellectual functioning and

anxiety disorder. *Id.* On October 4, 2004, another psychologist performed a Psychiatric Review Technique and corroborated diagnoses of borderline intellectual functioning and anxiety disorder. (Tr. at 176 and 180). On February 7, 2005 a third psychiatric source completed a Psychiatric Review Technique, corroborating the diagnoses of an organic mental disorder and anxiety-related disorder and adding a diagnosis of affective disorder. (Tr. at 276). On October 5, 2005, a case manager at Prestera found Claimant to have Major Depressive Disorder, Recurrent and Moderate, with resulting moderate to marked dysfunction in several functional categories. (Tr. at 257-269). Finally, on February 11, 2005, a clinical psychologist at Prestera found Claimant to have a full scale IQ score of 77 on the Weschler scale, with diagnoses of Major Depressive Disorder and borderline intellectual functioning by. (Tr. at 299-300).

Unquestionably, the record validates the existence of medically determinable mental impairments of borderline intellectual functioning, depression, and anxiety. Accordingly, the ALJ should have evaluated Claimant's mental impairments using the special technique outlined in 20 C.F.R. § 404.1520a. However, as reflected in his opinion, he neither explicitly, nor implicitly, invoked the special technique.

At the first step of the evaluation, the ALJ should have reviewed and documented the pertinent symptoms, signs, and laboratory findings outlined above, which supported the existence of medically determinable mental impairments. 20 C.F.R. § 404.1520a. Both the agency sources and Claimant's treating mental health specialists supplied more than adequate information that Claimant suffered from mental impairments. Yet, despite these opinions and their supporting documentation, the ALJ's decision

inexplicably disregarded them.  (Tr. at 17-21).   He made no mention of the existence of medically determinable mental impairments.

The ALJ similarly failed to acknowledge, assess, and document the limitations resulting from Claimant's mental impairments at step two of the evaluation.  *Id.*  The ALJ dispensed with his mandate to rate the degree of functional limitation in each of the four broad categories described in 20 C.F.R. § 404.1520a(c). His decision is devoid of any mention of this task, which, in itself, is a violation of the regulations.   20 C.F. R. § 404.1520a(e).

Having failed to fully evaluate and clearly document the functional limitations, if any, that flowed from Claimant's mental impairments, the ALJ was hard-pressed to accurately rate the degree of severity of the impairments, as required at step three of the special technique.  In fact, the ALJ avoided this dilemma by simply overlooking the need to assign a severity rating to Claimant's mental impairments.  He did not refute their existence, downplay their intensity, or argue their minimal impact on Claimant's allegations of disability.  He simply made no mention of them, at all, in his discussion of Claimant's impairments.  (Tr. at 17).

This defect of process irreversibly tainted the remainder of the ALJ's sequential evaluation, including his determination as to whether Claimant's impairments, separately or in combination, met or equaled a listed impairment.  The ALJ, without providing any rationale, again overlooked Claimant's mental impairments in this analysis, as though he was unaware of the record before him.  He did not discount the opinions and evidence, he just ignored them.  For example, the ALJ did not address Claimant's August 10, 2004 full scale IQ score of 70. This score, in combination with the

19

ALJ's finding that Claimant suffered from severe physical impairments of "back, leg, arm and hand pain" arguably could meet Listing 12.05C, which is satisfied by "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 CFR Part 404, Subpart P, Appendix 1. The ALJ provided no insight in his decision as to how, or if, he considered the combined effect of Claimant's severe musculoskeletal impairments with his depression, anxiety, and borderline intelligence. (Tr. at 17, 19). Instead, the ALJ only addressed Claimant's musculoskeletal impairments. (Tr. at 19). "When faced with a combination of multiple physical and mental impairments, the Commissioner should 'consider the combined effect of all. . .impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.' 20 C.F.R. § 404.1523." *Alderman v. Chater,* 40 F.Supp.2d 367 (N.D.W.Va. 1998). "It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Contrary to this principle, the ALJ limited his evaluation to Claimant's physical capabilities, failing to consider the impact of the documented mental impairments on Claimant's overall ability to perform basic work activities.

The ALJ first mentioned Claimant's mental impairments late in his decision. After the ALJ had concluded that Claimant was physically improved beginning on October 18, 2005, he assessed Claimant's RFC for the second time. At this point, the ALJ discussed the Claimant's mental impairments; primarily, in relation to Claimant's credibility. The ALJ stated the following:

> The claimant testified to having problems with anxiety and depression. He stated that he has been going to Prestera for treatment. However, he cannot remember when he started receiving treatment.
> ...
> The claimant testified that he completed the 8th grade and attended learning disability classes. The claimant reported that he can read and write "somewhat" and cannot do math problems. He subsequently worked as a pizza delivery person, construction worker, laborer, and tractor trailer driver.
> ...
> The claimant testified that he has problems with anxiety and depression, and he receives treatment from Prestera. However, the evidence of record shows that claimant only received treatment for mental impairments from October 2004 through December 2004.

(Tr. at 20).

Although the ALJ finally acknowledged the conditions, he still only considered them in relation to Claimant's complaints of physical pain, stating, "Given all of the above, the undersigned concludes that the claimant's allegations of disabling pain are deemed excessive, not fully credible and are treated accordingly."   (Tr. at 21). Furthermore, he incorrectly recited the facts of Claimant's treatment at Prestera in his decision and failed to mention the reports provided by the agency sources.  In truth, Claimant had treated at Prestera for over a year, and his treatment had not been terminated as of the last visit record.  The ALJ likewise excluded consideration of the mental impairments in the hypothetical questions that he posed to the vocational expert.  As a result, no expert testimony was elicited as to whether the impairments of depression, anxiety and borderline intelligence would eliminate all or some of the available jobs identified by the vocational expert.

The Commissioner argues that these oversights by the ALJ constitute harmless error. (Def. Br. at 7).   However, it is impossible to logically reach that conclusion.  As a corollary to the application of the sequential evaluation process, the ALJ must

adequately explain his analysis and conclusions so that a reviewing Court can determine whether the decision is supported by substantial evidence. "[T]he [Commissioner] is required by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C. § 557(c), to include in the text of [his] decision a statement of the reasons for that decision." *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ's "decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge." *Hammond v. Heckler,* 765 F.2d 424, 426 (4th Cir. 1985). Unquestionably, the ALJ failed to fulfill that charge in regard to Claimant's mental impairments.

For the reasons stated above, the ALJ's failure to fully and fairly consider Claimant's mental impairments cannot be viewed as harmless error. Instead, it casts into doubt the existence of substantial evidence to support the ALJ's decision. Having carefully considered the decision of the ALJ and the evidence of record, the undersigned finds that the ALJ failed to employ the "special technique" required to evaluate the mental impairment alleged by Claimant; therefore, the decision of the Commissioner was not supported by substantial evidence. 20 C.F.R. §§404.1520a; *see also Hardy v. Astrue,* 2010 WL 3341584 (N.D.W.Va.).

Accordingly, the undersigned respectfully proposes that the District Court **FIND** (1) that the ALJ failed to comply with 20 C.F.R. § 404.1520a, and (2) that this failure mandates a further finding that the final decision of the Commissioner was not supported by substantial evidence. Finally, the undersigned proposes that the Court **FIND** that this matter should be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

22

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** plaintiff's Motion for Judgment on the Pleadings (Docket No. 10), **DENY** defendant's Motion for Judgment on the Pleadings (Docket No. 11), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*,

727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

 The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

     **FILED:** December 3, 2010.

     Cheryl A.  Eifert
     United States Magistrate Judge